## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE AMBASSADOR GROUP LLC d/b/a AMBASSADOR CAPTIVE SOLUTIONS; GAGLIARDI INSURANCE SERVICES, INC.; GOLDENSTAR SPECIALTY INSURANCE, LLC; PERFORMANCE INSURANCE COMPANY SPC on behalf of GOLDENSTAR HOLDINGS COMPANY SP and on behalf of SMART INSURE SP; and BRANDON WHITE,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Lexington Insurance Company ("Lexington"), for its Complaint against Defendants The Ambassador Group LLC d/b/a Ambassador Captive Solutions ("Ambassador"), Gagliardi Insurance Services, Inc. ("Gagliardi Insurance"), Goldenstar Specialty Insurance, LLC ("Goldenstar Specialty"), Performance Insurance Company SPC ("Performance") on behalf of Goldenstar Holdings Company SP ("Goldenstar Holdings" and together with Goldenstar Specialty, "Goldenstar") and on behalf of Smart Insure SP ("Smart Insure"), and Brandon White ("White") (collectively with Ambassador, Gagliardi Insurance, Goldenstar Holdings, and Goldenstar Specialty, "Defendants"), hereby states as follows:

### NATURE OF THE ACTION

1.     This case involves a scheme to counterfeit insurance policies and defraud the public. Lexington is an insurance company that is a subsidiary of American International Group, Inc. ("AIG").  Lexington had (through an affiliate) an existing business relationship with

Ambassador and one of Ambassador's principals, White. In 2018, White and Ambassador sought to induce Lexington to enter into a further business arrangement in which Gagliardi Insurance (an insurance broker) would sell Lexington insurance policies to sports teams and leagues (principally youth sports), and Lexington would then reinsure those policies to Goldenstar Holdings, a captive insurer affiliated with Ambassador. Lexington declined that opportunity, more than once.

2. Undeterred by the declinations, White forged or caused the forgery of the signature of Joseph Davina (an AIG executive) on the documents White believed were necessary to effectuate the deal Lexington had declined, and then facilitated the issuance of at least 11 fraudulent insurance policies in Lexington's name (the "Gagliardi Insurance Fraud"). Those policies purport to insure hundreds (and maybe thousands) of sports teams and leagues, and an exponentially larger number of individual athletes. Some policies—for combat sports and football—have million-dollar limits for certain brain injuries. Every insured is under the impression that, if a loss occurs, a company affiliated with AIG will be there to pay the claim. In fact, however, *every policy at issue is a counterfeit*, and claims will be paid only if the fraudsters decide to pay them.

3. Ambassador and White went to great lengths to hide their fraud and were successful in their deceit—until they got caught. At every turn, White and Ambassador concealed their fraud by assuring AIG (in writing, no less) that the policies sold by Gagliardi Insurance had been issued by another commercial carrier, and not by Lexington. The fraud was finally exposed when one claims administrator sent AIG a copy of one of the transaction documents bearing Davina's forged signature. At that point, the jig was up.

4. Once caught, White and Ambassador *admitted* that Davina's signature was forged, although they professed to have no knowledge as to who had forged the signature, or why, as they

continued to claim that Lexington was not involved with this insurance program.  Later, when White and Ambassador retained counsel, they fessed up that the forged document was part of an active insurance program involving (counterfeit) Lexington policies.  With their fraud exposed and knowing that the policies issued by Gagliardi Insurance in Lexington's name were counterfeits, White and Ambassador then sought to retract their earlier admissions and claimed that Davina's signature was—contrary to their previous admissions—genuine after all.

5.      Subsequently, while investigating the Gagliardi Insurance Fraud, AIG discovered that White and Ambassador engaged in a separate, similar fraud against Lexington involving Texas homeowners/renters' insurance (the "Madera Residential Insurance Fraud").  This fraud also involves the issuance of counterfeit insurance policies and certificates of insurance thereunder bearing Lexington's name.  These insureds also believe that they are insured by an AIG company, but in fact are not.

6.      Defendants' conduct is plainly unlawful.  They have violated the Lanham Act, which prohibits the unauthorized use of Lexington's registered trademark and imposes the harshest punishments in counterfeiting schemes like those here.  The Lanham Act specifically authorizes this Court to issue appropriate injunctive relief to protect Lexington's trademark and put an end to these insidious fraud schemes.  In addition to violating federal trademark law, Defendants are liable under myriad state laws designed to prevent and punish deceptive trade practices, the misappropriation of another's name, and insurance fraud (including the issuance of counterfeit insurance policies).  Lexington seeks injunctive relief to put an end to Defendants' ongoing and brazen fraud scheme and to recover damages for the harm their fraud has inflicted on Lexington.

## JURISDICTION AND VENUE

7.      This Court has federal subject matter jurisdiction over Lexington's federal claims under Section 39 of the Lanham Act (15 U.S.C. § 1121) and 28 U.S.C. §§ 1331 and 1338, and under 28 U.S.C. § 1332 as there is diversity of citizenship between the parties and the matter in controversy exceeds $75,000, exclusive of interest and costs.

8.      This Court has supplemental jurisdiction over Lexington's state and common law claims under 28 U.S.C. § 1367(a) because they form part of the same case and controversy and derive from a common nucleus of operative facts.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Lexington's claims occurred in this District as Ambassador and White are based in Louisville, Kentucky and much of the fraud occurred in Kentucky.

10.     This Court has personal jurisdiction over The Ambassador Group LLC d/b/a Ambassador Captive Solutions because it is located, domiciled, doing business, and otherwise found in Kentucky.

11.     This Court has personal jurisdiction over Brandon White as, upon information and belief, he is domiciled in Kentucky, residing at 5008 Hickory Hill Drive, Lagrange, Kentucky.

12.     This Court has personal jurisdiction over Gagliardi Insurance Services, Inc. under Ky. Rev. Stat. § 454.210(2)(a)(1) as it transacts business in the Commonwealth with (i) Ambassador, a Kentucky company, and (ii) White, a Kentucky resident.

13.     This Court has personal jurisdiction over Performance Insurance Company SPC on behalf of Goldenstar Holdings Company SP and on behalf of Smart Insure SP under Ky. Rev. Stat. § 454.210(2)(a)(1) as it transacts business in the Commonwealth with (i) Ambassador, a Kentucky company, and (ii) White, a Kentucky resident.

14.     This Court has personal jurisdiction over Goldenstar Specialty Insurance, LLC under Ky. Rev. Stat. § 454.210(2)(a)(1) as, upon information and belief, it transacts business in the Commonwealth with (i) Ambassador, a Kentucky company, and (ii) White, a Kentucky resident.

## PARTIES

15.     Plaintiff Lexington Insurance Company is a Delaware company with a principal place of business at 99 High Street, Boston, Massachusetts 02110.

16.     Defendant Gagliardi Insurance Services, Inc. is a Pennsylvania corporation with a principal place of business at 1010 N. Hancock Street, Philadelphia, Pennsylvania 19123. Defendant Gagliardi Insurance Services, Inc. also has offices and conducts business in California.

17.     Defendant The Ambassador Group LLC d/b/a Ambassador Captive Solutions is a Kentucky limited liability company with a principal place of business at 9700 Park Plaza Avenue, Unit 201, Louisville, Kentucky 40241.

18.     Upon information and belief, Defendant Brandon White is a Kentucky resident, residing at 5008 Hickory Hill Drive, Lagrange, Kentucky 40031.

19.     Upon information and belief, Defendant Performance Insurance Company SPC is a segregated portfolio company based in the Cayman Islands which maintains an office in the United States at 9700 Park Plaza Avenue, Unit 201, Louisville, Kentucky 40241.

20.     Upon information and belief, Goldenstar Holdings Company SP is a segregated portfolio of Performance Insurance Company SPC based in the Cayman Islands.

21.     Upon information and belief, Smart Insure SP is a segregated portfolio of Performance Insurance Company SPC based in the Cayman Islands.

22.     Upon information and belief, Defendant Goldenstar Specialty Insurance, LLC (formerly known as Goldenstar Underwriting Company, LLC) is a Pennsylvania limited liability company with a principal place of business at 1315 Walnut Street, Suite 1101, Philadelphia, Pennsylvania 19107.

## STATEMENT OF FACTS

### A.     Lexington Is a Leading Insurance Company and a Member of AIG

23.     AIG is a publicly owned holding company.  Its numerous subsidiaries and operating companies provide a diverse range of property and casualty insurance, life insurance, retirement products, mortgage insurance, and related financial services to its customers and clients.

24.     Lexington is an AIG subsidiary that has operated as an excess and surplus line insurance company for more than 50 years.

25.     Lexington is domiciled and licensed in Delaware and is an eligible surplus and excess lines insurer in all states other than Delaware, and in the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.  It is one of the largest excess and surplus lines carriers in the United States.

26.     Lexington owns the U.S. Trademark Registration No. 1499895 for "LEXINGTON" for the underwriting of insurance (the "Lexington Mark").  A true and accurate copy of the registration certificate is attached as Exhibit A.

27.     Lexington has continuously used the Lexington Mark in interstate commerce since April 1965 for underwriting insurance.

28.     Over the last 50 years, Lexington has underwritten its insurance products using the Lexington Mark across the United States.  The insurance brokerage community recognizes the Lexington Mark and associates it with Lexington.

**B.     AIG's Business Relationship with Defendants—"Captive Reinsurance"**

29.     AIG's business relationship with Defendants relates to an area of insurance known as "captive reinsurance."  Captive reinsurance programs are complex multi-party arrangements that require specialized expertise and significant underwriting capacity.

30.     In the type of captive reinsurance program at issue here, an insurance broker or other company (the "Broker/Owner") forms and owns a captive reinsurance company (the "Captive").  The Captive is ultimately responsible for paying some or all of the losses on policies sold by the Broker/Owner.

31.     Because Captives are not licensed direct insurers, the Broker/Owner seeks to engage a commercial insurer (such as Lexington, AIG's subsidiary surplus lines insurer) (an "Issuing Carrier") to issue the insurance policies to be sold and then reinsure such policies to the Captive.  The apportionment of risk between the Issuing Carrier and the Captive is typically documented in a reinsurance agreement through which the Captive (as the reinsurer) agrees to reimburse the Issuing Carrier for some or all of the losses incurred under the policies.

32.     Typically, the Captive pays the Issuing Carrier a fee or commission payment for acting as the Issuing Carrier.  In addition, the Captive provides collateral to the Issuing Carrier to secure, among other things, the Captive's obligation to reimburse the Issuing Carrier for any reinsured losses that the Issuing Carrier incurs.

33.     These complex transactions are often facilitated by a "captive intermediary," an entity that assists a Broker/Owner in developing an actuarial model and business plan, forming the Captive, and—most importantly—identifying an Issuing Carrier to issue the policies to be sold by the Broker/Owner and reinsured to the Captive.  Ambassador is such a captive intermediary, founded by White in 2011 in Louisville, Kentucky.

### C.   Ambassador Solicits Lexington's Participation in the Gagliardi Insurance Program

34.    In early 2018, White contacted AIG to see if AIG would be interested in working with Ambassador on captive reinsurance programs.  He explained that QBE Insurance Group, Ltd. ("QBE") was the carrier for most captive arrangements in Ambassador's portfolio, but that Ambassador was looking for a change, and was interested in moving its entire captive portfolio to AIG.

35.    In June 2018, AIG executives met in Louisville with White and others at Ambassador to discuss such opportunities.  Following that meeting, an AIG-affiliated insurer (not Lexington) agreed to act as the Issuing Carrier for two different group captive programs in Ambassador's portfolio.  Throughout 2018 and 2019, AIG regularly communicated with White and his Ambassador colleagues regarding these two group captive programs, including two additional in-person meetings with White

36.    In August 2018, White solicited AIG to act as the Issuing Carrier for a different captive program in Ambassador's portfolio—a captive reinsurance program involving policies that would be sold by a broker, Gagliardi Insurance (the "Gagliardi Insurance Program").  White and Ambassador explained that the Gagliardi Insurance Program would provide accident and health ("A&H") coverage for various youth and professional sports teams and leagues.  As part of the Gagliardi Insurance Program, Ambassador would create Goldenstar Holdings, a segregated portfolio of Performance ultimately owned by Gagliardi Insurance and based in the Cayman Islands, to serve as a captive reinsurer.  Goldenstar Holdings is owned by Gagliardi Insurance, so Gagliardi Insurance is the Broker/Owner, and Goldenstar Holdings is the Captive.

37.    The Gagliardi Insurance Program contemplated the execution of a Managing General Agent Agreement ("MGA Agreement") or Program Administration Agreement ("PA

Agreement"), under which Gagliardi Insurance would have the ability to issue policies in the name of the AIG-affiliated insurer serving as the Issuing Carrier.

38.     The designated third-party administrator ("TPA") for the Gagliardi Insurance Program was Health Special Risk, Inc. ("HSR").  TPAs provide a range of services like claims administration and adjudication, payment processing, and record-keeping.  AIG maintains a list of approved TPAs and has a business division that vets, approves, and monitors TPAs.  HSR was not on AIG's list of approved TPAs.  Davina informed White at the outset that, if AIG agreed to underwrite the Gagliardi Insurance Program, HSR would need to undergo AIG's rigorous approval and onboarding process, which could take months.

### D.     Lexington Declines to Participate in the Gagliardi Insurance Program

39.     After reviewing the submission documents for the Gagliardi Insurance Program, AIG decided not to participate.  AIG never performed any actuarial or credit analysis on the proposed program and never even generated a quote.  The Gagliardi Insurance Program was not suitable for AIG and the application was quickly rejected.

40.     In or around October 2018, Davina made clear to White that AIG was not interested in the Gagliardi Insurance Program.

41.     After AIG declined to participate in the Gagliardi Insurance Program, White asked AIG several more times over the following months to revisit the opportunity.  Each time, AIG's affiliated companies declined to underwrite the program.

### E.     Although AIG Declined the Program, HSR Believes Lexington is the Issuing Carrier

42.     In December 2018, HSR—believing that the Gagliardi Insurance Program went into effect with Lexington on July 1, 2018—emailed Davina requesting to move forward with a formal TPA agreement.

43.     Davina immediately questioned White about the email because neither Lexington nor AIG had agreed to participate in the Gagliardi Insurance Program.

44.     White responded by asking Davina not to call HSR back.  According to White, HSR's error was just a miscommunication "on the client side."  Davina and AIG relied on that misrepresentation and did not engage in any further investigation.  A true and accurate copy of this email chain is attached as Exhibit B.

**F.     White's Fabricated Email and Continued Deception**

45.     Upon information and belief, a week later, White (or someone on his behalf) fabricated an email purporting to be from Davina's AIG email account to White and another Ambassador principal, Darin Smith.  In the fabricated email, Davina appeared to grant "conditional approval" on AIG's behalf for HSR to manage claims until AIG formally approved HSR.  White sent the fake email to HSR conveying what appeared to be AIG's green light for HSR to proceed as the TPA.

46.     HSR (presumably believing the email to be genuine) forwarded the email to Davina, who immediately confronted White and Smith, about it.  Smith denied that either he or White had any knowledge of the fabrication and stated that he and White were trying to figure out who was responsible.  A true and accurate copy of this email chain is attached as Exhibit C.

47.     In January 2019, White met Davina at AIG's office in New York to discuss, among other things, the two group captive arrangements for which another AIG company (not Lexington) was acting as the Issuing Carrier.  During that meeting, Davina again inquired about the fabricated email purportedly sent from his email account.  White assured Davina that no one from Ambassador was involved in the fabrication and would never engage in such conduct.  Davina and AIG relied on these misrepresentations and did not engage in any further investigation.

**G.      White Continues to Deceive AIG: The Letter of Credit Inquiry**

48.      In February 2019, Goldenstar Holdings' insurance manager, Atlas Insurance Management ("Atlas"), emailed Davina.  (A captive manager such as Atlas provides professional services to captive reinsurers, including regulatory and compliance oversight, ensuring adherence to corporate formalities, financial reporting assistance, and general recordkeeping and administrative assistance.)  Atlas's email to Davina sought language for a letter of credit, which ostensibly was to serve as Lexington's collateral from Goldenstar Holdings for the Gagliardi Insurance Program.

49.      Davina again confronted White, asking why AIG was continuing to receive correspondence about the Gagliardi Insurance Program that AIG's affiliated companies declined to underwrite.

50.      White apologized that AIG kept "getting tagged" and passed it off as a "miscommunication on the clients [sic] part and messaging from the captive manager."  Davina and AIG relied on that misrepresentation and did not engage in any further investigation.  A true and accurate copy of this email chain is attached as Exhibit D.

**H.      The Forged Reinsurance Agreement, Part I**

51.      Also in February 2019, Helmsman Management Services ("Helmsman") emailed Davina introducing itself as the new TPA for the Gagliardi Insurance Program.  When Davina replied that no AIG-affiliated insurance carrier was the Issuing Carrier for the Gagliardi Insurance Program, Helmsman provided Davina with an unsigned draft of a facultative reinsurance agreement between Goldenstar Holdings and Lexington.

52.      Davina forwarded the draft agreement to White to find out what was going on. White, seeking to mislead Davina, responded that it was a draft based on a template that AIG

provided him earlier in the year but confirmed that it was "***not an agreement with Lexington***" and that the unsigned agreement was "***not in effect, obviously***."  (emphasis added).  Davina and AIG relied on that misrepresentation and did not engage in any further investigation.  A true and accurate copy of this email chain is attached as <u>Exhibit</u> <u>E</u>.

I.      **The Forged Reinsurance Agreement, Part II: White Admits to the Forgery**

53.     On November 19, 2019, Atlas (Ambassador's captive manager) emailed Davina (copying Ambassador) a "fully executed Facultative Reinsurance Agreement" with a signature purporting to be Davina's on Lexington's behalf dated August 17, 2018 (the "<u>Forged</u> <u>Reinsurance</u> <u>Agreement</u>").  A true and accurate copy of the Forged Reinsurance Agreement is attached as <u>Exhibit</u> <u>F</u>.  In the body of the November 19th email to Davina, Atlas requested wiring instructions for Lexington's "commission payment."

54.     The signature on the Forged Reinsurance Agreement is not Davina's.  Davina never signed any agreement with Goldenstar Holdings and never authorized anyone to do so on his behalf.  White acknowledged this in February 2019, when he made clear that the agreement was "***not in effect, obviously***."  *See* Ex. E (emphasis added).

55.     Davina responded to Atlas and Ambassador, telling Atlas that the agreement is forged and demanding that White explain the forgery.

56.     White responded by apologizing for the *"**misrepresentation**"* and assuring Davina that the forged contract *"**did not come from Ambassador in any way**."*  (emphasis added).  White said that he was "***working to track down the genesis of [the] document***" and promised to "***get to the bottom***" of it.

57.    That is, White admitted that Davina's signature on the Forged Reinsurance Agreement was indeed a forgery, but White claimed to be ignorant as to who forged Davina's signature, or why.  A true and accurate copy of this email chain is attached as <u>Exhibit G</u>.

**J.     The Forged Reinsurance Agreement, Part III: White Tries to Retract His Admission That the Forged Reinsurance Agreement Was Forged**

58.    On February 7, 2020, Ambassador and White, through counsel, tried to retract White's admissions made in February and December of 2019 that the (signed and unsigned) Forged Reinsurance Agreement "***was not in effect, obviously***," was a "***misrepresentation,*" and *"did not come from Ambassador in any way***."   Ambassador and White now claimed, for the first time, that White—contrary to all of his earlier statements—witnessed Davina sign the agreement in May 2019 and back-date it to August 2018.  A true and accurate copy of the letter from Ambassador's and White's counsel is attached as <u>Exhibit H</u>.

**K.     Lexington Learns of Counterfeit Insurance Policies Bearing the Lexington Mark**

59.    After discovering the Forged Reinsurance Agreement, it was imperative for Lexington to determine whether Gagliardi Insurance or anyone else was using the Forged Reinsurance Agreement to support an actual captive reinsurance program.

60.    Lexington reached out to the various entities that appeared to be involved in the Gagliardi Insurance Program based on the pitch materials that Ambassador sent to Lexington in 2018.

61.    On December 13, 2019, Lexington (through counsel) sent letters seeking documents and information regarding the Forged Reinsurance Agreement and the Gagliardi Insurance Program to White, Ambassador's two other principals (Aaron Lubbers and Smith), Atlas, Goldenstar Holdings, Helmsman, HSR, and Gagliardi Insurance.  Lexington warned each

of those parties that the Forged Reinsurance Agreement is fraudulent and demanded that each party refrain from representing to anyone that it is valid or enforceable.

62.    Atlas and Goldenstar Holdings responded through counsel but provided little information about the Gagliardi Insurance Program.

63.    Helmsman responded to confirm that it never acted as the TPA for the Gagliardi Insurance Program.

64.    Despite follow-up letters and phone calls, neither HSR nor Gagliardi Insurance ever responded to Lexington's requests for information.

65.    On February 7, 2020, Ambassador (through counsel) stated that, according to White, White witnessed Davina sign the Forged Reinsurance Agreement on May 9, 2019 and backdate it to August 17, 2018.  Ex. H.

66.    On March 3, 2020, Ambassador (through counsel) provided copies of 11 insurance policies issued in Lexington's name purportedly on Goldenstar Holdings' behalf in connection with the Gagliardi Insurance Program (the "Counterfeit Insurance Policies").  A true and accurate copy of each policy is attached hereto as Exhibits I-S.

67.    Each of the Counterfeit Insurance Policies defines the "Company" as "the Lexington Insurance Company providing coverage under this Policy on behalf of Goldenstar Holdings Company."  Exs I-S.

68.    Each of the Counterfeit Insurance Policies bears the Lexington Mark.

69.    Under each of the Counterfeit Insurance Policies, the entity listed as the "Company" for notice purposes is listed as (i) "Goldenstar Underwriting Company, LLC: GOLDENSTAR HOLDINGS   COMPANY,"   (ii)   "Goldenstar   Underwriting   Company:   GOLDENSTAR HOLDINGS   COMPANY,"   or   (iii)   "Goldenstar   Specialty   Insurance:   GOLDENSTAR

HOLDINGS COMPANY."   Exs I-S.   Upon information and belief, Goldenstar Specialty was formerly known as "Goldenstar Underwriting Company, LLC."

70.     For nine of the 11 Counterfeit Insurance Policies, Gagliardi Insurance is listed as the policyholder.   Exs. I-J, L-R.   Upon information and belief, under these nine Counterfeit Insurance Policies, Gagliardi Insurance intended to issue, and in fact issued, certificates of insurance out of those policies to sports teams and leagues insuring accident and health risks (the "Gagliardi Counterfeit Certificates").    Some of the Counterfeit Insurance Policies cover catastrophic brain injury claims with limits as high as $1,000,000.  Exs. Q-R.

71.     The other two Counterfeit Insurance Policies were issued to Pony Baseball and Softball, Inc. and "NYASA, Inc. dba" as policyholders.  Exs. K, S.  Pony Baseball and Softball, Inc. is a youth sports federation comprising more than 500 youth teams in over 100 leagues. NYASA, Inc. is a youth and amateur sports federation in New York comprising teams and individuals competing in over 20 sports.

72.     Pony Baseball and Softball, Inc. and NYASA, Inc., along with all the certificate holders of the Gagliardi Counterfeit Certificates, were misled into believing that they are insured by Lexington when in fact they are not.  Those policyholders are not insured by any licensed insurer; Ambassador has defrauded those policyholders by causing the sale of the counterfeit Lexington insurance policies to them.

73.     Marco Gagliardi signed each of the Counterfeit Insurance Policies as the "Managing Director of Goldenstar Holdings," purportedly on Lexington's behalf "under [Goldenstar Holdings'] Agreements" with Lexington, even though Lexington has no agreements with Goldenstar Holdings.  Exs. I-S.

74.     The basic policy details are as follows:

| Policy No. | Policy Name | A&H Limit of Liability | Indemnity Limit of Liability | Exhibit |
|---|---|---|---|---|
| GAH000001 | Football and Cheerleading Base Policy | $100,000 | $250,000 | I |
| GAH020001 | Amateur Combat Base Policy | $2,500 - $100,000 | $100,000 | J |
| GAH040001 | Pony Baseball and Softball Base Policy | $100,000 - $500,000 | $250,000 | K |
| GAH050001 | Amateur Combat Base Policy | $50,000 | $100,000 | L |
| GAH060001 | Amateur Baseball and Softball Base Policy | $100,000 - $500,000 | $250,000 | M |
| GAH070001 | Professional Combat Base Policy | $50,000 | $100,000 | N |
| GAH080001 | Amateur Sports Base Policy | $25,000 - $100,000 | $250,000 | O |
| GAH090001 | Professional Combat Base Policy | $2,500 - $100,000 | $100,000 | P |
| GAH910001 | Football Cat Policy | $1,000,000 | $250,000 | Q |
| GNH030001 | Professional Combat Base Policy | $50,000<br><br>$1,000,000 life threatening brain injury | $250,000 | R |
| GSNASF80001 | NYASA Accident Policy | $50,000 - $100,000 (injury/medical) | $100,000<br><br>$250,000 agg. limit | S |

75.     Although the 11 policies are issued in Lexington's name, Lexington was not the Issuing Carrier.  Lexington never issued any of the policies and never authorized anyone to issue them on Lexington's behalf.  And Lexington never authorized anyone to use the Lexington Mark on the Counterfeit Insurance Policies or the Gagliardi Counterfeit Certificates issued thereunder.

76.     No AIG-affiliated insurance company ever agreed to act as the Issuing Carrier for the Gagliardi Insurance Program; Lexington never received any commission payment or premiums in connection with the Counterfeit Insurance Policies; it never received any collateral in connection with the Forged Reinsurance Agreement; it never authorized any TPA to administer claims on the Counterfeit Insurance Policies; and it was not even aware of the Counterfeit Insurance Policies

until March 2020, when it was investigating Ambassador's fraud in connection with the Forged Reinsurance Agreement.

77.     Significantly, captive reinsurance programs are complex, multi-party arrangements that take months to analyze and document.  These are not "off-the-shelf" products.  Before one of AIG's affiliated insurers would agree to act as the Issuing Carrier for a program such as the Gagliardi Insurance Program, it would conduct robust diligence involving multiple business units. Among other things,  it would conduct detailed actuarial,  financial and credit analyses; it would calculate the required collateral; it would enlist counsel to assist in drafting documents; and it would  generate and provide the captive intermediary with a quote, and, if the quote is accepted, develop and provide a detailed binder setting forth the terms of the AIG affiliate's engagement. This process is multi-step, intensive, and typically takes many months to complete.  No part of that detailed process occurred with respect to the Gagliardi Insurance Program, because, as stated above, AIG's affiliated companies declined to write this program.  Moreover, Davina did not even have the authority to execute the Forged Reinsurance Agreement and any such agreement would not have been with Lexington, but with another AIG company.  Hence, White and Ambassador forged or caused the forgery of the signature of the wrong person on behalf of the wrong company.

78.     For Gagliardi Insurance to have had the authority to issue policies in Lexington's name, Gagliardi Insurance would need an MGA or PA Agreement granting it authority to issue policies or certificates on the insurer's behalf.  No such agreement exists.

79.     After learning of the Counterfeit Insurance Policies, Lexington requested that Ambassador provide Lexington with the MGA or PA Agreement under which the policies were underwritten and issued.

80.     Ambassador (through counsel) has denied any knowledge of any such agreement.

81.   Gagliardi Insurance—the entity that issued the policies under authority supposedly granted under one or more agreements with Lexington—has refused to respond *at all* to any of Lexington's multiple requests for information and documents.

82.   Upon information and belief, Gagliardi Insurance knew or should have known that the policies and certificates were counterfeits, which could explain Gagliardi Insurance's refusal to participate in Lexington's investigation.

83.   During its investigation, Lexington discovered that numerous claims (totaling approximately $1,000,000) have been made on the Counterfeit Insurance Policies and Gagliardi Counterfeit Certificates, and those claims have apparently been paid by Goldenstar Holdings. There are, no doubt, more claims to come.

84.   Upon information and belief, White, Ambassador, Goldenstar, and others (including Gagliardi Insurance) created, issued (or orchestrated creation and issuance of), and provided services in connection with the Counterfeit Insurance Policies and the Gagliardi Counterfeit Certificates as part of a scheme to defraud Lexington and policyholders.

85.   In so doing, White, Ambassador, Goldenstar, and others (including Gagliardi Insurance) infringed (directly or contributorily) upon the Lexington Mark, committed insurance fraud, and engaged in a host of deceitful business practices.  This not only defrauded and harmed Lexington but constitutes a fraud on the public by selling insurance policies and certificates purportedly issued and backed by Lexington when in fact those policies are counterfeits and backed only by what limited, attachable assets the Defendants may have.

**L.      Lexington Discovers the Madera Residential Insurance Fraud**

86.      While investigating the Gagliardi Insurance Fraud, Lexington discovered an entirely separate captive reinsurance program through which White and Ambassador have caused even more counterfeit Lexington policies to be fraudulently issued.

87.      In April 2019, White pitched a different captive reinsurance program to Davina, who asked Vince Perrotta, an AIG underwriter, to respond to White's proposal.  That program involved property and personal liability insurance coverage to be issued to residents of properties operated by Madera Residential, Ltd. ("Madera Residential") with Smart Insure as the captive reinsurance company (the "Madera Residential Insurance Program").

88.      Madera Residential operates more than 50 large-scale real estate developments throughout Texas, consisting of more than 1,000 apartments.  The Madera Residential Insurance Program was designed to provide homeowner's and personal liability insurance to residents.

89.      Lexington did not agree to act as the Issuing Carrier for the Madera Residential Insurance Program.

90.      Not only did Lexington never sign any agreements in connection with the Madera Residential Insurance Program but, as with the Gagliardi Insurance Program, Lexington never even conducted an actuarial or credit analysis on the program and never provided Ambassador with a quote.

91.      In April 2019, the TPA for the Madera Residential Insurance Program, Broadspire Services, Inc. ("Broadspire"), emailed Perrotta about an invoice for the program.  Perrotta responded by requesting information about the Madera Residential Insurance Program.

92.    That same day, Perrotta forwarded the Broadspire email to White commenting that he thought Madera Residential was the "prospect" they had discussed the day before.  Perrotta asked White to point Broadspire to the right carrier.

93.    White responded by apologizing and explaining that "this is with another program." White said he would "take the lead here" but noted that he does want "this in your group . . . so let's try and get it done!"  Perrotta and AIG relied on that misrepresentation and did not engage in any further investigation.  A true and accurate copy of this email chain with White is attached as Exhibit T.

94.    Broadspire emailed Perrotta again twice in early May 2019 with invoices for Lexington in connection with Madera Residential Insurance Program.  Perrotta responded both times that Lexington did not write the Madera Residential Insurance Program.

95.    Broadspire emailed Perrotta yet again in late May 2019 with a "prefund invoice." Broadspire followed up before Perrotta could respond, apologizing and letting Perrotta know that they were still working with their finance department to route the invoices to the correct party.

96.    In September 2019, Broadspire emailed Perrotta once again to advise that they were handling claims on Smart Insure's behalf.  Broadspire had received an "Evidence of Property Insurance" (a type of certificate of insurance) from one of the insured residents and asked Perrotta to provide a copy of the actual policy and confirm that the policy number was correct.

97.    The Evidence of Property Insurance provided by Broadspire purported to reflect an insurance policy with (a) Lexington as the insurer; (b) Annel Ramirez as the insured; and (c) Avion Apartments in Irving, Texas as the property (the "Ramirez Policy").  A true and accurate copy of the Evidence of Property Insurance for the Ramirez Policy Broadspire sent to Perrotta is attached hereto as Exhibit U.  The Ramirez Policy purportedly provided personal liability coverage of

$100,000 and personal property coverage of $25,000 with an effective policy period of March 1, 2019 through March 1, 2020.

98.     The address for Lexington on the Evidence of Property Insurance—3 Beaver Valley Road, Wilmington, Delaware—is not an address that Lexington has ever used for insurance certificates or policies.  *See* Ex. U.  Neither Lexington nor any AIG-affiliated insurance company currently has any office at that location.

99.     The policy number on the Evidence of Property Insurance for the insured is a policy number that was used for a series of annual insurance policies that were issued to a different AIG insured by an AIG-affiliated insurer for the October 1, 1986 to October 1, 1993 policy periods. Ambassador and Smart Insure have apparently recycled old AIG-related policy numbers to give their fraud a veneer of legitimacy.

100.     Upon information and belief, White created the captive, Smart Insure (which, upon information and belief, is another cell of Performance), for the Madera Residential Insurance Program.

101.     Upon information and belief, White advised Sanford & Tatum ("Sanford"), the insurance agency listed on the Evidence of Property Insurance, that the Madera Residential Insurance Program is governed by a "master policy" but White only provided Sanford with an unsigned version of it.  Upon information and belief, White also advised Sanford that the unsigned master policy was in effect, Lexington would sign the master policy, and that Lexington was the Issuing Carrier on the program.

102.     Upon information and belief, numerous certificates of insurance had been issued in connection with the Madera Residential Insurance Program.  Upon information and belief, each bears the Lexington Mark (the "Madera Counterfeit Certificates").

103.     Upon information and belief, the Ramirez Policy was renewed and is currently (purportedly) in effect.

104.     As with the Gagliardi Insurance Program, White, Ambassador, and Smart Insure formed the Madera Residential Insurance Program without any Issuing Carrier.  In so doing, they infringed upon the Lexington Mark, engaged in deceptive and unfair trade practices, and defrauded policyholders who believe they have insurance with Lexington but do not.

## COUNT ONE

**Counterfeiting and Trademark Infringement**
**Under 15 U.S.C. §§ 1114, 1116, and 1117**
(*Against Defendants Gagliardi Insurance and*
*Performance on behalf of Goldenstar Holdings and Smart Insure*)

105.     Lexington repeats and realleges each paragraph above as if set forth fully and verbatim herein.

106.     Lexington owns the U.S. Trademark Registration No. 1499895 for "LEXINGTON" for the underwriting of insurance.

107.     Without Lexington's authorization or consent, Gagliardi Insurance, Goldenstar Holdings, and Smart Insure each used a reproduction, counterfeit, copy, and colorable imitation of the Lexington Mark (the "Counterfeit Mark") in connection with the issuance, offer, or sale of the Counterfeit Insurance Policies and Gagliardi Counterfeit Certificates and Madera Counterfeit Certificates (and with the Gagliardi Counterfeit Certificates, the "Counterfeit Certificates").

108.     Upon information and belief, Gagliardi Insurance, Goldenstar Holdings, and Smart Insure each used the Counterfeit Mark, each knew or should have known of Lexington's well-known and prior rights in the Lexington Mark, and each knew or should have known that their products bear counterfeit marks.

109. The Counterfeit Mark is a spurious mark that is identical to or substantially indistinguishable from the Lexington Mark.

110. Specifically,

a. Upon information and belief, without Lexington's authorization or consent, Goldenstar Holdings and Gagliardi Insurance issued insurance policies for sports teams and leagues and/or certificates of insurance thereunder bearing the Counterfeit Mark, knew or should have known of Lexington's well-known and prior rights in the Lexington Mark, and knew or should have known that their insurance products bear counterfeit marks; and

b. Upon information and belief, without Lexington's authorization or consent, Smart Insure intentionally issued certificates of insurance bearing the Counterfeit Mark to individuals owning or renting property in residential complexes owned or managed by Madera Residential (and the insurance policies under which those certificates were issued) with knowledge of Lexington's well-known and prior rights in the Lexington Mark and with knowledge that their products bear counterfeit marks.

111. Gagliardi Insurance's, Goldenstar Holdings', and Smart Insure's use of the Lexington Mark on the Counterfeit Insurance Policies and Counterfeit Certificates is likely to cause confusion or mistake and to deceive consumers into believing that Lexington is the source, issuer, insurer, reinsurer, or underwriter of the Counterfeit Insurance Policies and Counterfeit Certificates.

112.    Gagliardi Insurance's, Goldenstar Holdings', and Smart Insure's use of the Lexington Mark has caused actual confusion in the marketplace, including among insurance agencies and third-party administrators, including Broadspire, Helmsman, HSR, and Sanford.

113.    Lexington does not underwrite—and has never underwritten—the Counterfeit Insurance Policies and Counterfeit Certificates, did not issue the Counterfeit Insurance Policies and Counterfeit Certificates, and did not license or otherwise authorize any Defendant to use the Lexington Mark on the Counterfeit Insurance Policies and Counterfeit Certificates.

114.    Gagliardi Insurance, Goldenstar Holdings, and Smart Insure have offered their Counterfeit Insurance Policies and Counterfeit Certificates for sale using the Lexington Mark with, upon information and belief, the intention of misleading, deceiving, or confusing consumers as to the origin and insurer of the Counterfeit Insurance Policies and Counterfeit Certificates.

115.    Gagliardi Insurance, Goldenstar Holdings, and Smart Insure have offered their Counterfeit Insurance Policies and Counterfeit Certificates for sale using the Lexington Mark with, upon information and belief, the intention of trading on Lexington's reputation and goodwill.

116.    The foregoing conduct constitutes trademark counterfeiting and trademark infringement under Section 32 of the Lanham Act (15 U.S.C. § 1114(1)).

117.    As a direct and proximate result of the foregoing trademark counterfeiting and infringement, Lexington has suffered and will continue to suffer monetary damages and loss of goodwill in an amount yet unknown but to be determined at trial.

118.    Gagliardi Insurance, Goldenstar Holdings, and Smart Insure have unfairly acquired income, profits, and goodwill at Lexington's expense.

119.    Gagliardi Insurance's, Goldenstar Holdings', and Smart Insure's acts of counterfeiting and infringement have caused and will continue to cause substantial and irreparable

injury to Lexington if the Court does not restrain Gagliardi Insurance, Goldenstar Holdings, and Smart Insure from further violation of Lexington's rights, and Lexington has no adequate remedy at law.

120.    Based on the foregoing conduct, Lexington is entitled to:

(a)    injunctive relief under 15 U.S.C. § 1116 enjoining Gagliardi Insurance, Goldenstar Holdings, and Smart Insure from further infringing on Lexington's trademark;

(b)    all gains, profits, and advantages that Gagliardi Insurance, Goldenstar Holdings, and Smart Insure obtain as a result of Defendants' unlawful and infringing actions under 15 U.S.C. § 1117;

(c)    enhanced damages, treble damages, and/or statutory damages of up to $2,000,000 per counterfeit mark per type of goods sold, offered for sale, or distributed, including each type of insurance policy issued, under 15 U.S.C. § 1117; and

(d)    reasonable attorneys' fees and costs under 15 U.S.C. § 1117.

## COUNT TWO

**Indirect (Contributory and Vicarious) Trademark Counterfeiting and Infringement
Under 15 U.S.C. §§ 1114, 1116, 1117
(*Against White, Ambassador, and Goldenstar Specialty*)**

121.    Lexington repeats and realleges each paragraph above as if set forth fully and verbatim herein.

122.    The Counterfeit Mark appearing on the Counterfeit Insurance Policies and Counterfeit Certificates issued, upon information and belief, by Goldenstar Holdings, Smart Insure, and Gagliardi Insurance is a spurious mark that is identical to or substantially indistinguishable from the genuine Lexington Mark.

123.    The use of the Counterfeit Mark on the Counterfeit Insurance Policies and Counterfeit Certificates is likely to cause confusion or mistake and deceive consumers into believing that Lexington is the insurer, issuer, or underwriter of the Counterfeit Insurance Policies and Counterfeit Certificates.

124.    Upon information and belief, White orchestrated the counterfeiting scheme and is a moving, active, conscious force behind Gagliardi Insurance's, Goldenstar Holdings', and Smart Insure's infringement.

125.    Upon information and belief, White has the ability to bind Ambassador in transactions with third parties.

126.    Upon information and belief, Ambassador has joint control over the infringing products with Goldenstar Holdings and Smart Insure.

127.    Upon information and belief, Ambassador and White have caused Gagliardi Insurance, Goldenstar Holdings, and Smart Insure to manufacture, distribute, issue, or sell the Counterfeit Insurance Policies and Counterfeit Certificates without authorization or license from Lexington.

128.    Upon information and belief, Ambassador and White intentionally induced Gagliardi Insurance, Goldenstar Holdings, and Smart Insure to counterfeit and infringe the Lexington Mark and to issue or sell the Counterfeit Insurance Policies and Counterfeit Certificates.

129.    Upon information and belief, Goldenstar Specialty has provided services to Gagliardi Insurance and Goldenstar Holdings in connection with issuing, distributing, or administering the Counterfeit Insurance Policies that Gagliardi Insurance and/or Goldenstar Holdings sold without authorization or license from Lexington.

130.    The foregoing acts of causing another to manufacture or issue and providing services in connection with issuing, distributing, and administering the Counterfeit Insurance Policies and Counterfeit Certificates, and the relationships described above, were necessary to the intentional use of a counterfeit mark and trademark infringement.

131.    But for White's orchestration of, and White's and Ambassador's involvement in, the counterfeiting scheme, there would have been no (i) Counterfeit Insurance Policies provided to sports teams and leagues by Goldenstar Holdings and Gagliardi; and (ii) Counterfeit Certificates provided to Madera Residential property owners and tenants by Smart Insure.

132.    Ambassador and White supplied and continue to supply services to Gagliardi Insurance, Goldenstar Holdings, and Smart Insure, whom they knew or had reason to know were engaging in trademark infringement.

133.    Upon information and belief, Goldenstar Specialty supplied and continues to supply its services to Gagliardi Insurance and Goldenstar Holdings, who it knew or had reason to know were engaging in trademark counterfeiting and infringement.

134.    White's, Ambassador's, and Goldenstar Specialty's unauthorized actions in interstate commerce as described above constitute contributory and vicarious counterfeiting and trademark infringement under the Lanham Act Sections 32, 34, and 35 (15 U.S.C. §§ 1114, 1116, and 1117).

135.    As a direct and proximate result of White's, Ambassador's, and Goldenstar Specialty's indirect trademark counterfeiting and infringement, Lexington has suffered and will continue to suffer monetary damages and loss of goodwill in an amount yet unknown but to be determined at trial.

136.    Defendants have unfairly acquired income, profits, and goodwill at Lexington's expense.

137.    White's, Ambassador's, and Goldenstar Specialty's acts of indirect counterfeiting and infringement have caused and will continue to cause substantial and irreparable injury to Lexington if this Court does not restrain Defendants from further violation of Lexington's rights, and Lexington has no adequate remedy at law.

138.    Based on the foregoing conduct, Lexington is entitled under 15 U.S.C. § 1116 to injunctive relief for the irreparable harm that Lexington has sustained and will sustain as a result of White's, Ambassador's, and Goldenstar Specialty's unlawful and contributory infringing actions, and all gains, profits, and advantages obtained as a result thereof, enhanced damages, treble damages, and/or statutory damages of up to $2,000,000 per type of goods sold, offered for sale or distributed, including each type of insurance policy issued, and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1117.

## COUNT THREE

### Unfair Competition and False Designation of Origin
### Under 15 U.S.C. §§ 1116, 1117, and 1125(a)
### (*Against All Defendants*)

139.    Lexington repeats and realleges each paragraph above as if set forth fully and verbatim herein.

140.    The Lexington Mark is inherently distinctive or has acquired distinctiveness.

141.    Defendants are using the Lexington Mark in commerce without Lexington's authorization, thereby misappropriating the Lexington Mark.

142.    Ambassador, White, Goldenstar Specialty, and Smart Insure are willfully and knowingly misappropriating the Lexington Mark.

143.    Upon information and belief, Gagliardi Insurance and Goldenstar Holdings are willfully and knowingly (or should have known that they are) misappropriating the Lexington Mark.

144.    By misappropriating and using the Lexington Mark in commerce, Defendants misrepresent and falsely describe to the general public the origin, source, issuer, insurer, and/or underwriter of the Counterfeit Insurance Policies and Counterfeit Certificates, and create a likelihood of confusion among consumers as to the origin, source, issuer, insurer, and/or underwriter of the Counterfeit Insurance Policies and Counterfeit Certificates.

145.    Defendants' unauthorized and unlicensed distributing, offering for sale, issuance, or sale of the Counterfeit Insurance Policies and Counterfeit Certificates creates express and implied misrepresentations that the policies were authorized, approved, issued, insured, or underwritten by Lexington, which will damage both Lexington and the public.

146.    Defendants are profiting from their unauthorized and unlicensed distribution, offering for sale, issuance, or sale of the Counterfeit Insurance Policies and Counterfeit Certificates at Lexington's and the public's expense.

147.    Upon information and belief, Defendants' unauthorized and unlicensed issuance and sale of the Counterfeit Insurance Policies and Counterfeit Certificates in interstate commerce using the Lexington Mark constitutes use of a false designation of origin or false representation that wrongfully and falsely designates Defendants' Counterfeit Insurance Policies and Counterfeit Certificates as originating from or connected with Lexington, and constitutes the use of false descriptions or representations in interstate commerce in violation of Sections 34, 35, and 43(a) of the Lanham Act (15 U.S.C. §§ 1116, 1117, and 1125(a)).

148.     As a direct and proximate result of Defendants' acts of unfair competition described above, Lexington has suffered and will continue to suffer monetary damages and loss of goodwill in an amount yet unknown but to be determined at trial.

149.     Defendants have unfairly acquired income, profits, and goodwill at Lexington's expense.

150.     Defendants' acts of unfair competition will cause substantial and irreparable injury to Lexington if this Court does not restrain Defendants from further violation of Lexington's rights, and Lexington has no adequate remedy at law.

151.     Based on the foregoing conduct, Lexington is entitled to injunctive relief under 15 U.S.C. § 1116 for the irreparable harm that Lexington has sustained and will sustain as a result of unlawful and infringing actions, and all gains, profits, and advantages obtained by Defendants as a result, enhanced damages, treble damages, and/or statutory damages of up to $2,000,000 per type of goods sold, offered for sale, or distributed, including each type of insurance policy issued, and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1117.

## COUNT FOUR

### Misappropriation of Name
### (*Against All Defendants*)

152.     Lexington repeats and realleges each paragraph above as if set forth fully and verbatim herein.

153.     Upon information and belief, Defendants, for their own advantage, gain, or benefit, counterfeited insurance policies, purportedly issued by Lexington and containing Lexington's name.

154.     Defendants acted without authority or right to issue insurance policies in Lexington's name.

155.   In addition, upon information and belief, White and Ambassador forged or caused the forgery of a Lexington executive's signature on the Forged Reinsurance Agreement.

156.   White and Ambassador acted without authority or right to execute or cause the execution of the Forged Reinsurance Agreement on Lexington's behalf.

157.   As a direct and proximate result of Defendants' unlawful appropriation of Lexington's name, Lexington has suffered and will continue to suffer monetary damages in an amount yet unknown but to be determined at trial.

158.   Defendants' unlawful appropriation of Lexington's name has caused and will continue to cause substantial and irreparable injury to Lexington if Defendants are not restrained by this Court from further violation of Lexington's rights, and Lexington has no adequate remedy at law.

159.   Based on the foregoing conduct, Lexington is entitled to injunctive relief and damages.

## COUNT FIVE

**State Law Unfair Competition**
**Under California, Kentucky, Pennsylvania, New York, and**
**Texas Common Law and Cal. Bus. & Prof. Code § 17200, *et seq.***
**(*Against All Defendants*)**

160.   Lexington repeats and realleges each paragraph above as if set forth fully and verbatim herein.

161.   Lexington is the exclusive owner of all right and title to the Lexington Mark.

162.   Lexington operates under the trade name "Lexington Insurance Company" (the "Lexington Trade Name").

163.   The Lexington Mark and the Lexington Trade Name are inherently distinctive or have acquired distinctiveness.

164.     Both the Lexington Mark and the Lexington Trade Name identify Lexington as the particular issuer or underwriter of insurance policies bearing its name or mark in the mind of the public.

165.     Defendants are using the Lexington Mark and Lexington Trade Name in commerce, thereby misappropriating the Lexington Mark and the Lexington Trade Name.

166.     By misappropriating and using the Lexington Mark and the Lexington Trade Name in commerce, Defendants misrepresent and falsely describe to the general public the origin and source of the Counterfeit Insurance Policies and Counterfeit Certificates, and create a likelihood of confusion by purchasers as to the source, issuer, and/or underwriter of the Counterfeit Insurance Policies and Counterfeit Certificates.

167.     Defendants' unauthorized and unlicensed manufacturing, distribution, issuance, and sale of the Counterfeit Insurance Policies and Counterfeit Certificates creates express and implied misrepresentations that those policies were issued, underwritten, or authorized by Lexington, which will damage both Lexington and the public.

168.     Lexington does not underwrite the Counterfeit Insurance Policies and Counterfeit Certificates and did not license or otherwise authorize Defendants to use the Lexington Mark or the Lexington Trade Name on the Counterfeit Insurance Policies and Counterfeit Certificates.

169.     Upon information and belief, Defendants acted in bad faith while misappropriating the Lexington Mark and Lexington Trade Name.

170.     Upon information and belief, Defendants intentionally reproduced, copied, or imitated the Lexington Mark and Lexington Trade Name.

171.     Upon information and belief, Defendants are using the Lexington Mark and the Lexington Trade Name with the intent to mislead customers.

172.     Defendants actions are unlawful as they violate multiple provisions of the Lanham Act, as described above.

173.     Defendants actions are unfair business practices as they have misappropriated the Lexington Mark and Lexington's Trade Name to the detriment of Lexington and are not justified in such misappropriation.

174.     Defendants actions are fraudulent as they are likely to deceive the public.

175.     Defendants' actions constitute a violation of Cal. Bus. & Prof. Code § 17200, *et seq*.

176.     Defendants' actions constitute unfair competition under the common law of the States of California, Kentucky, New York, Pennsylvania, and Texas.

177.     As a direct and proximate result of Defendants' misappropriation of the Lexington Mark and/or Trade Name, Lexington has suffered and will continue to suffer monetary damages and loss of goodwill in an amount yet unknown, but to be determined at trial.

178.     Defendants have unfairly acquired income, profits, and goodwill at Lexington's expense.

179.     Defendants' acts of misappropriation have caused and will continue to cause substantial and irreparable injury to Lexington if this Court does not restrain Defendants from further violation of Lexington's rights, and Lexington has no adequate remedy at law.

180.     Based on the foregoing conduct, Lexington is entitled to injunctive relief, damages sustained as a result of Defendants' unfair competition, as alleged herein, all profits and advantages obtained by Defendants as a result thereof, and exemplary and punitive damages for Defendants' intentional misconduct.

## COUNT SIX

### Insurance Fraud
### Under K.R.S. §§ 304.47-020(1)(d), (1)(g), and (5)
### (*Against All Defendants*)

181.    Lexington repeats and realleges each paragraph above as if set forth fully and verbatim herein.

182.    Upon information and belief, Defendants issued or knowingly presented the Counterfeit Insurance Policies and Counterfeit Certificates.

183.    The Counterfeit Insurance Policies and Counterfeit Certificates are fake or counterfeit insurance policies and certificates of insurance that purport to evidence insurance underwritten by Lexington.

184.    Lexington did not issue or underwrite the Counterfeit Insurance Policies and Counterfeit Certificates.

185.    The foregoing conduct violates Ky. Rev. Stat. § 304.47-020(1)(d).

186.    Upon information and belief, Defendants aided and abetted and conspired with each other to commit the fraudulent insurance act of issuing or knowingly presenting the Counterfeit Insurance Policies and Counterfeit Certificates.

187.    Specifically, upon information and belief, Ambassador and White orchestrated the counterfeiting scheme and were and are moving, active, conscious forces behind the other Defendants' issuance of the Counterfeiting Insurance Policies and Counterfeit Certificates.

188.    Defendants' aiding and abetting and conspiring conduct violates of Ky. Rev. Stat. § 304.47-020(1)(g).

189.    As a direct and proximate result of Defendants' acts of insurance fraud, Lexington has suffered and will continue to suffer monetary damages in an amount yet unknown but to be determined at trial.

190.    Defendants' acts of insurance fraud have and will cause substantial and irreparable injury to Lexington if Defendants are not restrained by this Court, and Lexington has no adequate remedy at law.

191.    Based on the foregoing conduct, Lexington is entitled to injunctive relief and, under Ky. Rev. Stat. § 304.47-020(5), compensatory damages, including all reasonable investigation and litigation expenses, including attorneys' fees at the trial and appellate courts.

## COUNT SEVEN

### Fraud
### (*Against Defendants Ambassador and White*)

192.    Lexington repeats and realleges each paragraph above as if set forth fully and verbatim herein.

193.    Between December 2018 and February 2019, Ambassador and/or White made the following material misrepresentations to Lexington:

    a.    The reason HSR was contacting Lexington about moving forward with a TPA agreement in connection with the Gagliardi Insurance Program was because of miscommunication "on the client side" (*see* Ex. B);

    b.    Ambassador and White did not have any knowledge about the fabricated email purporting to be from Davina's AIG email account to White and Smith and that they were "trying to figure out exactly how this occurred and who is responsible" (*see* Ex. C); and

    c.    AIG kept "getting tagged" in connection with the Gagliardi Insurance Program because of "a mix of miscommunication on the clients [sic] part and messaging from the captive manager" (*see* Ex. D);

194.    Each of the foregoing statements was false because White and Ambassador knew where each of the "miscommunications" and fraudulent documents came from—themselves.

195.    Ambassador and White knew each of the foregoing statements to be false when they made them to Lexington.

196.    Ambassador and White made each of the foregoing statements with the intent to induce Lexington to act based on them.

197.    Lexington relied on White's and Ambassador's material misrepresentation identified above and acted on that reliance.

198.    Specifically, Lexington did not commence a full investigation to discover the source of the fraud.

199.    As a direct and proximate cause of Ambassador's and White's unlawful fraudulent conduct, Lexington has incurred monetary damages in an amount yet unknown, but to be determined at trial.

200.    Based on the foregoing conduct, Lexington is entitled to damages in an amount to be determined at trial.

## COUNT EIGHT

**Negligence Per Se**
**Under K.R.S. § 466.70**
(*Against Defendants Ambassador and White*)

201.    Lexington repeats and realleges each paragraph above as if set forth fully and verbatim herein.

202.    Ambassador and White violated penal statutes Ky. Rev. Stat. §§ 516.030 and 516.040, forgery in the second and third degree, that do not provide for an inclusive civil remedy.

203.    Specifically, Ambassador and White falsely affixed, or caused another to falsely affix, on the Forged Reinsurance Agreement a signature purporting to be Davina's on Lexington's behalf.

204.    Neither Davina nor any Lexington executive executed the Forged Reinsurance Agreement.

205.     Ambassador and White forged or caused the forgery of the signature on the Forged Reinsurance Agreement with the intent to deceive consumers and its business partners, including TPAs, into believing that Lexington issued and underwrote the insurance policies issued pursuant to the Forged Reinsurance Agreement.

206.     Ky. Rev. Stat. §§ 516.030 and 516.040 are intended to protect those whose signatures are forged and those that suffer negative consequences as a result of the forgery.

207.     Lexington is in the class of persons the statutes are intended to protect.

208.     As a direct and proximate cause of Ambassador's and White's violation of Ky. Rev. Stat. §§ 516.030 and 516.040, Lexington has incurred financial damages and potential liability from the insurance agreements issued in its name pursuant to the Forged Reinsurance Agreement.

209.     The foregoing injury is the type Ky. Rev. Stat. §§ 516.030 and 516.040 were designed to prevent.

210.     Based on the foregoing conduct, Lexington is entitled to damages in an amount to be determined at trial.

## COUNT NINE

### Declaratory Relief
### (*Against All Defendants*)

211.     Lexington repeats and realleges each paragraph above as if set forth fully and verbatim herein.

212.     Upon information and belief, Defendants orchestrated the means by which and/or created, provided, and/or sold the Counterfeit Insurance Policies and Counterfeit Certificates to individual policyholders in Lexington's name.

213.     Lexington did not authorize or license Defendants to create, provide, or sell insurance policies and certificates of insurance in its name.

214. A ripe and justiciable controversy exists between Lexington and Defendants regarding the validity of the Counterfeit Insurance Policies and Counterfeit Certificates.

215. As a result, Lexington seeks an order:

a. Declaring that the Forged Reinsurance Agreement is void;

b. Declaring that the Counterfeit Insurance Policies and Counterfeit Certificates are void;

c. Declaring that Lexington is not responsible for any claims made under the Counterfeit Insurance Policies and Counterfeit Certificates or any other insurance policies fraudulently issued by Defendants; and

d. Directing Defendants must notify all policyholders of the Counterfeit Insurance Policies and Counterfeit Certificates that Lexington is not providing them insurance.

## REQUEST FOR RELIEF

WHEREFORE, Lexington requests the following relief:

A. Judgment in Lexington's favor on all its claims;

B. A temporary restraining order and preliminary injunction:

1. Restraining, enjoining, and prohibiting each Defendant, their agents, employees, officers, attorneys, successors, assigns, affiliates, and all persons in privity or in active concert or participation with any of them from:

a. Representing to anyone that AIG, Lexington, or another AIG-affiliated insurance company issued any insurance policies or is responsible for any loss with respect to the Gagliardi Insurance Program or Madera Residential Insurance Program;

b. Issuing any additional insurance policies bearing the name of Lexington or any other AIG-affiliated insurance company;

c. Using in any manner the Lexington Mark and Lexington Trade Name in offering for sale, selling, distributing, or advertising any and all goods or services, including, but not limited to, all insurance products, insurance policies, certificates of insurance, insurance forms, or any other documents purporting to evidence insurance; and

        d.      Transferring or dissipating the proceeds of any premiums or other monies received from the sale of any insurance policies bearing the Lexington Mark in any way, other than: (i) transfer to a segregated account for the protection of the policyholders; or (ii) payment of legitimate claims made on such policies bearing the Lexington Mark.

C.     A permanent injunction:

      1.     Restraining, enjoining, and prohibiting Defendants, their agents, employees, officers, attorneys, successors, assigns, affiliates, and all persons in privity or in active concert or participation with any of them from using in any manner the Lexington Mark and Lexington Trade Name in offering for sale, selling, distributing, or advertising any and all goods or services, including, but not limited to, all insurance products, insurance policies, certificate of insurance, or any other documents purporting to evidence insurance;

      2.     Requiring each Defendant to send, by email and mail sent through the United States Postal Service, to each known policyholder of the Counterfeit Insurance Policies and Counterfeit Certificates a notice to the effect that Defendants have been engaged in selling Counterfeit Insurance Policies and Counterfeit Certificates in Lexington's name and that the insurance policies the customers purchased are not genuine Lexington insurance policies;

      3.     Ordering any existing insurance-related materials bearing the Lexington Mark or Lexington Trade Name be turned over to Lexington or destroyed; and

      4.     Restraining, enjoining, and prohibiting Defendants from transferring or dissipating the proceeds of any premiums or other monies received from the sale of any insurance policies bearing the Lexington Mark in any way, other than: (i) transfer to a segregated account for the protection of the policyholders; or (ii) payment of legitimate claims made on such policies bearing the Lexington Mark.

D.     An award in the amount of the total of (i) Lexington's actual damages and/or statutory damages at Lexington's election against Defendants, where any award of actual damages arising from the Defendants' violation of 15 U.S.C. §§ 1114 and 1125(a) should be trebled under 15 U.S.C. § 1117; (ii) the profits realized by each Defendant by reason of their unlawful acts alleged herein; (iii) punitive and consequential damages; (iv) Lexington's reasonable attorneys' fees; and (v) prejudgment interest on all amounts;

E.     A jury trial on all issues so triable; and

F.     Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: May 11, 2020

**STITES & HARBISON, PLLC**
*/s/ Joel T. Beres*
Joel T. Beres, Esq. (KBA No. 84376)
400 W. Market Street, Suite 1800
Louisville, Kentucky 40202
T: (502) 587-3400
F: (502) 587-6391
jberes@stites.com

**ALSTON & BIRD LLP**
Adam J. Kaiser, Esq. (*pro hac vice forthcoming)*
Joanna H. Schorr, Esq. (*pro hac vice forthcoming*)
90 Park Avenue
New York, New York 10016
T: (212) 210-9400
F: (212) 210-9444
adam.kaiser@alston.com
joanna.schorr@alston.com

*Counsel for Plaintiff*
*Lexington Insurance Company*